UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ROMEYN S.,

                 Plaintiff,

           -v-                         5:21-CV-322

COMMISSIONER OF
SOCIAL SECURITY,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
|---|---|
| OLINSKY LAW GROUP | HOWARD D. OLINSKY, ESQ. |
| Attorneys for Plaintiff | |
| 250 South Clinton Street, Suite 210 | |
| Syracuse, NY 13202 | |
| | |
| SOCIAL SECURITY | CANDACE LAWRENCE, ESQ. |
|   ADMINISTRATION | Special Ass't U.S. Attorney |
| Attorneys for Defendant | |
| J.F.K. Federal Building, Room 625 | |
| 15 New Sudbury Street | |
| Boston, MA 02203 | |

DAVID N. HURD
United States District Judge

**MEMORANDUM–DECISION & ORDER**

## I. INTRODUCTION

On March 22, 2021, plaintiff Romeyn S.[1] ("plaintiff" or "claimant") filed this action seeking review of the final decision of defendant Commissioner of Social Security ("Commissioner" or "defendant") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act").  The Commissioner has filed a certified copy of the Administrative Record and both parties have briefed the matter in accordance with General Order 18, which provides that an appeal taken from a final decision denying benefits will be treated as if the parties have filed cross-motions for a judgment on the pleadings.  *See* FED. R. CIV. P. 12(c).  Plaintiff's appeal will be considered on the basis of these submissions without oral argument.

## II. BACKGROUND

On December 12, 2016, plaintiff applied for DIB alleging that his bipolar disorder, depression, and anxiety had rendered him disabled beginning on July 15, 2016.  R. at 69–70.[2]  Plaintiff's claim was initially denied on March 6, 2017.  *Id.* at 80–85.

---

[1]  In accordance with a May 1, 2018 memorandum issued by the Judicial Conference's Committee on Court Administration and Case Management and adopted as local practice in this District, only claimant's first name and last initial will be mentioned in this opinion.

[2]  Citations to "R." refer to the Administrative Record.  Dkt. No. 11.

Thereafter, Administrative Law Judge ("ALJ") Elizabeth W. Koennecke held two hearings on plaintiff's claim: the first occurred on January 23, 2019, and the second occurred on May 13, 2019.  R. at 34–68.  The ALJ conducted both hearings from Syracuse, New York.  *Id*.  Plaintiff, represented at the first hearing by non-attorney representative Terri Schmidt and at the second hearing by attorney Megan Wicklund, appeared and testified.  *See id*.  At the second hearing, the ALJ also heard testimony from Vocational Expert Esperanza Distefano.  *Id*. at 57–68.

On May 23, 2019, ALJ Koennecke issued a written decision denying plaintiff's application for benefits.  R. at 10–21.  This decision became the final decision of the Commissioner on January 25, 2021, when the Appeals Council denied plaintiff's request for review.  *Id*. at 1–3.

## III.  <u>LEGAL STANDARD</u>

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

To qualify as disabled within the meaning of this definition, the Act requires that a claimant's:

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

The ALJ follows a five-step sequential evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520.[3] At step one, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity." § 404.1520(a)(4)(i). If so, the claimant is not disabled regardless of his medical condition or other factors. § 404.1520(b).

If the claimant is not engaged in substantial gainful activity, then step two requires the ALJ to determine whether the claimant has a "severe" impairment or combination of impairments; *i.e.*, a medically determinable condition that "significantly limits" his physical or mental ability to do basic work activities. § 404.1520(c).

If the claimant suffers from a severe impairment or combination of impairments, then step three requires the ALJ to determine whether the impairment(s) meet or equal an impairment specifically listed in Appendix 1

---

[3] Section 404.1520 sets forth the five-step evaluation used for DIB claims. A parallel set of regulations govern SSI applications. *See* 20 C.F.R. § 416.920(a)(4).

of the Regulations (the "Listings").  § 404.1520(d).  If the claimant's severe impairment(s) meet or equal one or more of the Listings, then the claimant is presumed to be disabled regardless of any other factors.  § 404.1520(a)(4)(iii).

If the claimant is not presumed disabled under one or more of the Listings, then step four requires the ALJ to assess whether—despite the claimant's severe impairment(s)—he has the residual functional capacity ("RFC") to perform his "past relevant work."  § 404.1520(e)–(f).  If so, the claimant is not disabled.  § 404.1520(a)(4)(iv).

Finally, if the claimant cannot perform his past relevant work, the Commissioner must determine if the claimant's RFC, in combination with his age, education, and work experience, permits the claimant to do any other work in the national economy.  § 404.1520(a)(4)(v), (f)–(g).

The burden of proof for the first four steps is on the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).  However, if the claimant shows he cannot perform his past relevant work at step four, the burden shifts to the Commissioner for step five.  *Id.*

The Act further provides for judicial review of "any final decision . . . made after a hearing" by the Social Security Administration ("SSA" or the "Agency").  42 U.S.C. § 405(g).  However, the scope of this review is limited to determining whether (1) the Commissioner applied the correct legal standard to his analysis and, if so, (2) whether the final decision is supported by

"substantial evidence." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (cleaned up).

"Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (cleaned up).  "If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." *Morales v. Berryhill*, 484 F. Supp. 3d 130, 140 (S.D.N.Y. 2020) (citation omitted).

However, this "deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003).  Thus, "where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards," the decision should not be affirmed.  *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).  This is so regardless of whether or not the decision is otherwise supported by "substantial evidence."  *See id*.

## IV.  <u>DISCUSSION</u>

The ALJ applied the five-step analysis to find that: (1) plaintiff had not engaged in substantial gainful activity since July 15, 2016, the alleged onset date; (2) plaintiff's mental impairment—variously characterized by mental health professionals as depressive, bipolar and related disorder, anxiety

disorder, generalized anxiety disorder, panic disorder, depression, and/or alcohol dependence—was a "severe" impairment within the meaning of the Regulations; and (3) this mental impairment or impairments, whether considered individually or in combination, did not meet or equal any of the Listings. R. at 13–15.

At step four, the ALJ determined that plaintiff retained the RFC perform a "full range of work at all exertional levels" with an extensive set of non-exertional limitations:

> understand and follow simple instructions and directions; perform simple tasks independently; maintain attention and concentration for simple tasks; regularly attend to a routine and maintain a schedule; handle simple, repetitive work-related stress in that the claimant can make occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require the claimant to supervise or manage the work of others; should avoid work requiring more complex interaction or joint effort to achieve work goals; and can tolerate superficial contact with the public.

R. at 15.

Next, the ALJ determined that plaintiff had past relevant work as a preschool teacher, middle school teacher, and as a reading improvement teacher, but that he was unable to perform any of this past work in light of the RFC finding. R. at 19–20. However, after considering plaintiff's age, education, and RFC in light of the Vocational Expert's testimony, the ALJ

concluded that plaintiff could still perform such representative jobs as a "garbage collector," a "salvage laborer," or a "marker." *Id*. at 20.

Because these representative jobs existed in the sufficient numbers in the national economy, the ALJ concluded that plaintiff was not disabled between July 15, 2016, the alleged onset date, through May 23, 2019, the date of her written decision.  R. at 21.  Accordingly, the ALJ denied plaintiff's application for benefits.  *Id*.

## A. <u>Plaintiff's Appeal</u>

Plaintiff contends that the ALJ (1) improperly assessed the three medical opinions offered by Miranda Mohabir, M.D., plaintiff's treating psychiatrist; and (2) failed to account for plaintiff's other, non-severe impairments when formulating the RFC.  Pl.'s Mem., Dkt. No. 16 at 14–26.[4]

### 1. <u>Dr. Mohabir's Opinions</u>

First, plaintiff contends the ALJ "failed to evaluate Dr. Mohabir's opinions according to SSA rules and regulations."  Pl.'s Mem. at 15.  As plaintiff explains, under the version of the Regulations that apply to his claim the ALJ should have given "controlling weight" to Dr. Mohabir's opinions "in light of the established longitudinal treatment relationship, supportability, and consistency of Dr. Mohabir's assessment[s]."  *Id*. at 16 (regarding first

---

[4]  Pagination corresponds with CM/ECF.

medical source statement); *see also id*. at 23 (asserting similar "controlling weight" argument as to Dr. Mohabir's later opinions).  According to plaintiff, Dr. Mohabir's three opinions—once found to be "controlling" as to the nature and severity of his non-exertional limitations—would have required the ALJ to find him *per se* disabled under Listing 12.04 or 12.06.  *Id*. at 23–24.

Broadly speaking, the Regulations divide evidence from a claimant's medical sources into three categories: (1) treating; (2) acceptable; and (3) other.[5]  The most important of these is the treating source category, which includes a claimant's "own physician, psychologist, or other acceptable medical source" who has provided "medical treatment or evaluation and who has, or has had an ongoing treatment relationship" with the claimant.  *Tammy Lynn B.*, 382 F. Supp. 3d at 193 (citation omitted).

The opinion of a treating source regarding the nature and severity of a claimant's impairments is entitled to *controlling* weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  *Tammy Lynn B.*, 382 F. Supp. 3d at 193 (citation omitted).

However, "[a] treating physician's statement that the claimant is disabled cannot itself be determinative."  *Tammy Lynn B.*, 382 F. Supp. 3d at 193

---

[5]  On January 18, 2017, the SSA revised the rules regarding the evaluation of medical evidence.  Because plaintiff's claim was filed before March 27, 2017, the prior Regulations still govern this appeal.  Defs.' Mem., Dkt. No. 19 at 12.

(citation omitted).  And when a treating source's opinion contradicts other substantial evidence in the record, such as the opinions of other medical experts, an ALJ may afford it less than controlling weight.  *Id.*

A treating physician's opinion may also be properly discounted, or even entirely rejected, when: (1) it is internally inconsistent; (2) the source lacks underlying expertise; (3) the opinion is brief, conclusory, or unsupported by clinical findings; or even where (4) it "appears overly sympathetic such that objective impartiality is doubtful and goal-oriented advocacy reasonably is suspected."  *Tammy Lynn B.*, 382 F. Supp. 3d at 193 (citation omitted).

Where an ALJ decides to afford a treating source's opinion less than controlling weight, he must still consider various factors in determining how much weight, if any, to give the opinion, including: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) what evidence supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the area of specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant in claimant's particular case.  *Tammy Lynn B.*, 382 F. Supp. 3d at 193–94 (citation omitted).

Beyond this so-called "treating physician rule," the same six factors set forth above apply with equal force to the evaluation of the remaining

categories of medical evidence recognized by the Regulations: the "acceptable" and "other" sources mentioned earlier.  *Erik Allen M. v. Berryhill*, 2019 WL 3565944, at *7 (N.D.N.Y. May 22, 2019).  The former, those deemed "acceptable" sources, include "licensed physicians (medical or osteopathic doctors, psychologists, optometrists, podiatrists, and speech-language pathologists."  *Id.* (citation omitted).  The latter category, deemed "other" in Administration parlance, are "ancillary providers such as nurse practitioners, physician assistants, licensed clinical social workers, and therapists."  *Id.*

Importantly, only evidence from a "treating" or "acceptable" source can be relied upon to establish the existence of an impairment.  *Erik Allen M.*, 2019 WL 3565944, at *7 (citation omitted).  However, evidence from all three sources "can be considered when determining severity of impairments and how they affect individuals' ability to function."  *Id.*

Finally, while the six-factor analysis set forth above applies in all cases except where "controlling" weight is given to a treating physician's opinion, an ALJ need not mechanically recite these factors as long as the record reflects a proper application of the substance of the rule.  *See, e.g.*, *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011) (summary order) (noting that an ALJ need not expressly recite each factor so long as it is "clear from the record as a whole that the ALJ properly considered" them).

Plaintiff's treating psychologist is Miranda Mohabir, M.D.  Plaintiff began treating with her on August 7, 2014.  *See* R. at 319.  As part of this treatment relationship, Dr. Mohabir completed a series of three "medical source statements" setting forth her professional opinion about the nature and severity of plaintiff's mental impairments.  *Id.* at 316–21, 540–44, 667–71.

Dr. Mohabir's first medical source statement is dated March 8, 2017.  R. at 316–21.  There, Dr. Mohabir opined that plaintiff experienced "moderate" limitation in his ability to understand, remember, and carry out detailed instructions, a "slight" limitation in his ability to make judgments about simple work-related decisions, "marked" limitation in his ability to respond appropriately to work pressures in a usual work setting, "moderate" limitation in his ability to interact appropriately with supervisors and to respond appropriately to changes in a routine work setting, and a "slight" limitation in his ability to interact with co-workers.  *Id.* at 316–17.

In Dr. Mohabir's opinion, these findings were supported by the fact that plaintiff's depression and anxiety affects his concentration and memory and his ability to persist and maintain functioning.  R. at 316–17, 319–21.  Dr. Mohabir also noted that plaintiff could become anxious or irritable "easily."  *Id.* at 316.  Based on these and other findings, Dr. Mohabir concluded that plaintiff was unable to work.  *Id.* at 317.

The ALJ summarized this March 2017 opinion as part of her narrative discussion of the medical evidence.  R. at 17.  Ultimately, she assigned it "some weight," reasoning that it was "supported by an accompanying mental status evaluation documenting poor attention/concentration, sad mood, and constricted affect."  *Id*.  The ALJ also noted that this March 2017 opinion was "supported by contemporaneous treatment notes indicating that overall, the claimant's depression and anxiety had improved."  *Id*.

Dr. Mohabir's second medical source statement is dated July 9, 2018.  R. at 540–44.  This document is formatted somewhat differently than her prior opinion from March 2017.  *Compare* R. at 316–21, *with id*. at 540–44.  In her second opinion, Dr. Mohabir opined that plaintiff's condition had worsened substantially.  *See id*. at 540–44.  For instance, Dr. Mohabir found plaintiff's "signs and symptoms" now included impulsive and damaging behavior, recurrent severe panic attacks, emotional withdrawal or isolation, decreased energy, thoughts of suicide, and difficulty thinking or concentrating.  *Id*. at 540.

Based on these and other findings, Dr. Mohabir concluded in this July 2018 opinion that plaintiff retained "no useful ability to function" in his ability to maintain regular attendance and be punctual within customary, usually strict tolerances, to work in coordination with or proximity to others without being unduly distracted, to complete a normal workday and

workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to deal with normal work stress, or even to use public transportation.  R. at 541.

The ALJ summarized this July 2018 opinion as part of her narrative discussion of the medical evidence.  R. at 17.  Ultimately, she assigned it "limited weight," reasoning that it signaled a "significant deterioration in the claimant's condition" that was not supported by the evidence.  *Id*. at 18.  By way of illustration, the ALJ noted that plaintiff reported "feeling much better" in an April 28, 2018 treatment note and that plaintiff's mood was "neutral" and he was "remaining sober" in an August 21, 2018 treatment note.  *Id*.  The ALJ also noted that throughout 2018 plaintiff received little treatment from Dr. Mohabir, and mostly treated with a social worker.  *Id*.

Dr. Mohabir's third medical source statement is dated January 4, 2019.  R. at 667–71.  In this third opinion, Dr. Mohabir opined that plaintiff's condition had slightly improved when compared to her July 2018 findings but remained worse than her initial observations from March of 2017.  *See id*.  For instance, Dr. Mohabir found that plaintiff's "signs and symptoms" continued to include impulsive and damaging behavior, recurrent severe panic attacks, emotional withdrawal or isolation, decreased energy, thoughts of suicide, and difficulty thinking or concentrating.  *Id*. at 667.

Based on these and other findings, Dr. Mohabir determined in this
January 2019 opinion that plaintiff was no longer completed deprived of his
"useful ability to function" in any area.  R. at 668.  However, Dr. Mohabir
concluded that plaintiff remained "unable to meet competitive standards" in
such areas as his ability to maintain attention for two hour segments, to
maintain regular attendance and be punctual within customary, usually
strict tolerances, to complete a normal workday and workweek without
interruptions from psychologically based symptoms, to perform at a
consistent pace without an unreasonable number and length of rest periods,
to deal with normal work stress, to travel in an unfamiliar place, or to use
public transportation.  *Id.*

The ALJ summarized this January 2019 opinion as part of her narrative
discussion of the medical evidence.  R. at 17.  Ultimately, she assigned it
"limited weight," reasoning that it again signaled a "significant deterioration
in the claimant's condition" that was not supported by other evidence in the
record.  *Id*. at 18.  For instance, the ALJ noted that plaintiff had reported
"slipping into depression again" but also that his "relationships continued to
improve and that he continued to maintain sobriety."  *Id.*  And while the ALJ
recognized that Dr. Mohabir found that plaintiff's "mood was sad and affect
was constricted," the ALJ rejected the idea that these findings supported the
conclusion that plaintiff retained *no* useful ability to function in those

areas.  *Id.*  As the ALJ explained, other mental status evaluations in the record, notes from routine office visits, and an examination performed by Dante Alexander, Psy.D, failed to support the "significant" functional limitations assessed by Dr. Mohabir in her January 2019 opinion.  *Id.*

Upon review, there is no error to be found in the ALJ's assessment of these three medical opinions.  First, plaintiff faults the ALJ for refusing to assign more weight to Dr. Mohabir's March 2017 opinion.  Pl.'s Mem. at 16–20.  In plaintiff's view, the ALJ incorrectly found that Dr. Mohabir had provided plaintiff "with very limited treatment prior to rendering" this first medical opinion in March of 2017.  *Id.* at 19.

To be sure, plaintiff correctly points out that he has treated with Dr. Mohabir since August 7, 2014.  Even so, there is nothing incorrect about the ALJ's conclusion that Dr. Mohabir had only rendered "very limited treatment" by March of 2017.  As an initial matter, the ALJ explicitly noted in her written decision that plaintiff had treated with Dr. Mohabir since August of 2014.  R. at 13.  Further, as the Commissioner points out in her opposition brief, although the treatment relationship may have existed as far back as August of 2014, Dr. Mohabir had actually *treated* plaintiff only three times in the one-year period that ran up to the issuance of her March 2017 medical source statement.  Def.'s Mem. at 14 (citing R. at 310, 311, 314).

Absent some indication that the ALJ misunderstood these underlying historical facts, there is nothing wrong with her decision to take into account the length or nature of this treating relationship.  Indeed, the Regulations explicitly required the ALJ to do so.  20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

Next, plaintiff faults the ALJ for "apply[ing] selective tactics" in evaluating Dr. Mohabir's March 2017 opinion.  Pl.'s Mem. at 17.  In plaintiff's view, the ALJ "referenced only one part" of the relevant document and then "ignor[ed] remarkable findings" despite the fact that "mental symptoms tend to wax and wane."  *Id.*

Again, though, the ALJ acted within her discretion in making these findings.  In assessing a disability claim, the ALJ must consider "all of the relevant medical and other evidence" in the record.  *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010).  But that does not mean that the ALJ is obligated to "reconcile explicitly every conflicting shred of medical testimony."  *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983).

Of course, an ALJ may not "cherry pick" evidence in the record to reach a preferred conclusion.  *See, e.g., Carisma A. ex rel. T.A. v. Comm'r of Soc. Sec.*, 516 F. Supp. 3d 301, 306 (W.D.N.Y. 2021).  "Cherry picking refers to

improperly crediting evidence that supports findings while ignoring conflicting evidence form the same source." *Id*. "Cherry picking can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." *Id*.

But there is a world of difference between, on the one hand, an ALJ listing several examples of conflicting evidence in the record that justify partially discrediting an opinion and, on the other, plucking out only the evidence that supports a particular result. While the latter might be forbidden, the former is the ALJ's stock-in-trade when analyzing the Administrative Record. In other words, not every reference by an ALJ to unfavorable evidence in the record amounts to a cherry-picked result.

This distinction manifests itself in the ALJ's written decision. While plaintiff is correct that the ALJ contrasted plaintiff's self-reports with Dr. Mohabir's findings in "one part of Exhibit 3F, page 1," it is inaccurate to say that the ALJ just proceeded to ignore other relevant findings. Pl.'s Mem. at 17. Instead, after summarizing and briefly discussing all three of Dr. Mohabir's opinions, the ALJ went on to discuss at substantial length the rest of the longitudinal record evidence that tended to undercut Dr. Mohabir's findings of extreme, disabling, ongoing mental symptoms. R. at 18–19.

In conducting this analysis, it is clear that the ALJ understood that mental symptoms tend to wax and wane. As the Ninth Circuit has explained,

in the context of mental health issues "[c]ycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances, it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014); *see also Frasier v. Berryhill*, 2018 WL 5801059, at *3 (W.D.N.Y. Nov. 6, 2018) ("Many mental illnesses are characterized by good days and bad days, rapid fluctuations in mood, or recurrent cycles of waxing and waning symptoms.").

In light of this confounding variable, courts have reversed when an ALJ relied "on a single comment from plaintiff that she felt 'happy' or that she experienced some 'improvement'" as a way to discount a "well-supported" conclusion by a treating source that the claimant could not handle a competitive work environment. *Fountaine v. Comm'r of Soc. Sec.*, 2019 WL 1428522, at *4 (W.D.N.Y. Mar. 29, 2019) (characterizing ALJ's justification as reflecting "an alarming misunderstanding of mental illness").

But as noted *supra*, the ALJ engaged in a relatively thorough discussion of the longitudinal evidence, which tended to demonstrate more improvement than regression.  R. at 17–19.  While this evidence led the ALJ to conclude that plaintiff should be limited to "unskilled work with *significant* social limitations," R. at 17 (emphasis added), there is no error in the ALJ's related

conclusion that Dr. Mohabir's even more severe assessments were in conflict with the greater weight of the rest of the medical record, *id*. at 18 –19.

There are two other aspects of the ALJ's written decision that bear some discussion. *See* Pl.'s Mem. at 21–23. First, in partially discounting the weight of Dr. Mohabir's opinions, the ALJ noted that the majority of her office treatment notes "contain just a recitation of the claimant's subjective complaints, and minimal objective clinical findings." R. at 18. According to plaintiff, "[r]eliance on [his] subjective complaints is an 'essential tool' in evaluating mental health impairment and is not sufficient reason to reject [a] treating physician's opinions." Pl.'s Mem. at 21.

Plaintiff is partially correct. To be sure, "[i]nterviewing a patient and assessing [their] self-reported symptoms can be an acceptable diagnostic technique when the condition complained of involves a substantial subjective component." *Samantha S.*, 385 F. Supp. 3d at 185 (citation omitted). But it is also true that, "[r]egardless of any inherent subjectivity in the field of psychiatry, a doctor cannot simply report what his patient says and re-package it as an opinion." *Id*. (quoting *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 629 (6th Cir. 2016) (unpublished disposition).

Thus, "[a] source's reliance on a claimant's subjective reports rather than the medical evidence constitutes a good reason for affording less weight to a medical opinion, even from a treating physician." *Merkley v. Comm'r of Soc.*

*Sec.*, 2017 WL 4512448, at *4 (N.D.N.Y. Oct. 10, 2017) (Suddaby, J.).  As the Commissioner points out in her own brief, the ALJ acted well within her discretion to rely on this factor as just one part of her larger analysis of the medical evidence.  Def.'s Mem. at 14 * n.3.

The remaining aspect of the written decision that requires brief discussion is the ALJ's observations that plaintiff "had not be[en] going to therapy for a while" in November of 2016, and that "[u]pdated counseling records noted that [plaintiff] was not compliant with treatment recommendations."  R. at 16, 18, 311, 674.  According to plaintiff, these statements demonstrate that the ALJ "penalize[d]" him for not being compliant with treatment recommendations, including therapy.  Pl.'s Mem. at 22.

After consideration of the record, this argument must be rejected.  Again, plaintiff is partially correct on this issue.  "Federal courts have recognized that failure to comply with treatment can be a direct result of bipolar disorder." *Jimmeson v. Berryhill*, 243 F. Supp. 3d 384, 391 (W.D.N.Y. 2017) (collecting cases).  And federal courts have "acknowledged more broadly that failure to comply with treatment may be a result of mental illness." *Id.*

With those realities in mind, courts have generally concluded that a claimant's non-compliance (with therapy, psychiatric treatment, prescription medication, or other modalities) is not a permissible basis on which to "draw negative credibility inferences" about the claimant.  *See, e.g., Anthony C. v.*

*Comm'r of Soc. Sec.*, 2021 WL 492432, at \*9 (W.D.N.Y. Feb. 10, 2021) (collecting cases).

But it is not *per se* inappropriate for the ALJ to make an observation about non-compliance, especially not as part of a larger discussion of whether or not plaintiff's symptoms improved with a steady course of treatment and/or whether non-compliance with treatment might be a relevant concern. *Cf. Anthony C.*, 2021 WL 492432, at \*9. As the Commissioner correctly notes in her own brief, there is no indication that these passing observations by the ALJ resulted in the assessment of any "penalties," whether to plaintiff's to credibility or otherwise. Def.'s Mem. at 20.

In sum, the ALJ did not err in her evaluation of Dr. Mohabir's three medical source statements. Instead, the ALJ discharged her responsibility to "choose between properly submitted medical opinions and other competent evidence to piece together an overall RFC assessment." *Samantha S.*, 385 F. Supp. 3d at 185 (cleaned up). "Plaintiff's disagreement with the ultimate factual determinations that the ALJ drew from this record evidence is not a basis for remand." *Tammy Lynn B.*, 382 F. Supp. 3d at 195. Accordingly, this argument must be rejected.

### 2. **Impairments & the RFC**

Second, plaintiff contends the ALJ failed to account for all of his various impairments when formulating the RFC finding. Pl.'s Mem. at 24–26. In

plaintiff's view, the ALJ "disregarded" his "chronic GERD condition," his "severe sleep apnea," or his "obesity." *Id*. at 24–25.  According to plaintiff, the ALJ's failure to account for these physical impairments renders the RFC determination unsupported by substantial evidence. *Id*. at 25.

"Where, as here, the ALJ finds at step two that a claimant has one or more 'severe' impairments but determines at step three that the claimant is not presumptively disabled, the ALJ must go on to make an RFC finding, which is an assessment of 'what an individual can still do despite his or her limitations.'" *Tammy Lynn B. v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 184, 192 (N.D.N.Y. 2019) (quoting *Cox v. Astrue*, 993 F. Supp. 2d 169, 183 (N.D.N.Y. 2012) (McAvoy, J.)).  "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, [and symptomatology], including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Samantha S. v. Comm'r of Soc. Sec.*, 385 F. Supp. 3d 174, 183 (N.D.N.Y. 2019) (citation omitted).

"The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources." *Rivera v. Comm'r of Soc. Sec.*, 368 F. supp. 3d 626, 640 (S.D.N.Y. 2019).  "In practice, administrative law judges rely principally on

medical source opinion and subjective testimony when assessing impaired individuals' ability to engage in work-related activities." *Tammy Lynn B.*, 382 F. Supp. 3d at 192–93 (citation omitted).

Upon review, this argument must also be rejected. Of course, "[an] RFC determination must account for limitations imposed by both severe and nonsevere impairments." *Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) (summary order). Importantly, though, a "non-severe" impairment is, by definition, a condition which causes only a "slight abnormality" which would have "no more than a minimal effect on an individual's ability to work." *Samantha S. v. Comm'r of Soc. Sec.*, 385 F. Supp. 3d 174, 187 (N.D.N.Y. 2019) (citation omitted).

As an initial matter, then, it is hard to argue that the ALJ erred in failing to include any specific exertional limitations related to his GERD, his sleep apnea, and/or his obesity without first claiming that one or more of these underlying conditions were sufficiently "severe" so as to impose more than a "minimal effect" on plaintiff's ability to work.

Even assuming otherwise, the burden is still on the claimant to demonstrate more than just a diagnosis—the claimant must also identify evidence to support a conclusion that the diagnosis at issue (*i.e.*, GERD, sleep apnea, and/or obesity) resulted in additional limitations for which the ALJ failed to account. *See* Def.'s Mem. at 21 (explaining these general principles).

Although plaintiff points out that he suffered from these conditions, he has not identified how any of these conditions caused him to suffer from exertional limitations that should have been included in the physical component of the RFC.  Absent that kind of threshold showing, it is impossible to conclude the ALJ committed any error, reversible or otherwise, in failing to assess a more restrictive physical RFC.  Accordingly, this argument will also be rejected.

## IV.  <u>CONCLUSION</u>

The ALJ applied the correct legal standards and supported her written decision with substantial evidence in the record.

Therefore, it is

ORDERED that

1.  The Commissioner's motion for a judgment on the pleadings is GRANTED;

2.  Plaintiff's motion for a judgment on the pleadings is DENIED;

3.  The Commissioner's decision is AFFIRMED; and

4.  Plaintiff's complaint is DISMISSED.

IT IS SO ORDERED.

Dated:  May 31, 2022
        Utica, New York.

David N. Hurd
U.S. District Judge